IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6164-Cr-DIMITROULEAS

UNITED STATES OF AMERICA,    :

       Plaintiff,    :

       v.    :

LORI KOSTENKO,    :

       Defendant.    :
_____:

**DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

Defendant, Lori Kostenko, through counsel, respectfully files the following objections to the

Presentence Investigation Report (PSI) prepared in this case:

**I.    DRUG QUANTITY/BASE OFFENSE LEVEL.**

Defendant objects to Paragraphs 7, 11, 20, 52, and 53, as well as the recitations on Pages 2

and 3 regarding the maximum and minimum sentence in this case.

At the time of the plea, the parties stipulated that the amount of cocaine involved in this case

for sentencing purposes is more than 400 grams but less than 500 grams. Accordingly, the statutory

penalty range is 0-20 years. The base offense level for this amount of cocaine is Level 24. Because

the drug quantity is less than 500 grams, there is no mandatory minimum sentence, and the safety

valve is not applicable. Defendant respectfully asks the Court to honor this stipulation between the



parties, which was fully disclosed at the time of the plea.[1]

## II.    ROLE IN THE OFFENSE.

At the time of the plea, the government agreed to take no position with respect to Defendant's request for a two level adjustment for minor role in the offense. The government reserved the right to object to any further adjustment for role in the offense (that is, a three or four level reduction). Defendant respectfully asks the Court to consider a four, three or two level reduction for role in the offense.

As reflected in the PSI, Lori Kostenko arrived in Ft. Lauderdale on June 5 of this year with cocaine secreted in her vagina. The cocaine had been given to her by a man named Peter in Jamaica. (PSI at 5). Ms. Kostenko was instructed to travel to Fort Lauderdale, where she would be met by an unknown person who would recognize Ms. Kostenko by her clothing. (PSI at 5). Ms. Kostenko was to turn the cocaine over to this individual, who in turn was to pay Ms. Kostenko $2,000.00. (PSI at 4). Ms. Kostenko was to have no further involvement with the cocaine or its distribution. Defendant respectfully suggests that these facts support a reduction of four, three or two levels for role in the offense.

§ 3B1.2 of the Sentencing Guideline reads, in pertinent part, as follows:

(a)    If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b)    If the defendant was a minor participant in any

---

[1] Because the safety valve is inapplicable, Defendant has not submitted a separate safety valve statement to the probation officer. If the Court determines that there is a mandatory minimum sentence in this case, and that the acceptance statement in the PSI is insufficient to merit a reduction, Defendant would ask for the opportunity to submit a safety valve statement.

criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

Ms. Kostenko played a minimal role in this offense. At most, she was a mule or courier used by others to assist in the importation of a relatively small amount of cocaine. See U.S.S.G. § 3B1.2 application note 2. Although not an excuse for her conduct, this does provide a basis for this Court to designate Ms. Kostenko as a "minimal participant" and reduce her offense level accordingly.

The commentary to U.S.S.G. § 3B1.2, explains that the "minimal participant" provision "is intended to cover defendants who are plainly among the least culpable of those in the conduct of a group. . .. It would be appropriate, for example, . . . in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S.S.G. § 3B1.2, comment. (n.1 & 2). While courier status alone does not compel a finding that the defendant was a minor or minimal participant, United States v. Veloza, 83 F.3d 380, 382 (11th Cir. 1996), such a finding is certainly permissible. "[T]he fact that a courier plays an essential role in an importation scheme does not alone necessarily preclude her from receiving a reduction for a minor role . . .. Indeed, the guidelines provide as much." Id.

The fundamental holding of Veloza was reiterated in United States v. De Varon, (175 F.3d 930 (11th Cir. 1999) (en banc). "Simply put," the Court explained, "the drug courier may or may not qualify for a minor role reduction." Id. at 942. The decision rests with the discretion of the sentencing court, and appellate courts will accord "deference to the district court's discretion in this uniquely fact-intensive inquiry." Id. at 940. Accordingly, a sentencing court's determination will be disturbed on appeal only where there is clear error. Id. at 938.

3

De Varon directs a sentencing court considering a mitigating role adjustment to look to two principles: "first, the defendant's role in the relevant conduct for which she has been held accountable at sentencing, and, second, her role as compared to that of other participants in her relevant conduct." Id. at 940.

The first principle simply requires the sentencing court "to measure the defendant's role against the relevant conduct for which she has been held accountable." Id. A mitigating role adjustment may not be determined with reference to some larger conspiracy, whether charged or not, but must be confined to the relevant conduct for which the defendant has been held responsible. Id. at 942. In this context, the amount of drugs involved in the relevant conduct "is a material consideration in assessing a defendant's role in her relevant conduct." Id.

The second guiding principle espoused in De Varon "is that the district court may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct." Id. at 944. This, again, is a "fact-intensive inquiry," as the sentencing court must weigh the defendant's conduct against the conduct of other identifiable participants in the relevant conduct attributed to the defendant. Id. If the court determines that the defendant was less culpable than most other participants in the relevant conduct, a downward adjustment is warranted. Id.

In the context of a drug courier, as in this case, the Eleventh Circuit offers some guidance as to what factual considerations are relevant. These factors include "amount of drugs, fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution." Id. at 945. This list is meant to be illustrative, not exhaustive. "In the final analysis, this decision falls within the sound discretion of the trial court." Id.

4

The factors identified in De Varon weigh in Ms. Kostenko's favor in this case. The relevant conduct in this case is approximately 500 grams of cocaine. While this is not a small amount, it is a fairly routine quantity for a body carrier in this District. Ms. Kostenko's role with respect to that relevant conduct was minor compared to at least two other identifiable individuals. The supplier, Peter, was the owner of the cocaine – the participant with the equity interest – or his representative. It was he who designed and implemented the plan to import, using Ms. Kostenko as a courier. On the distribution end, Ms. Kostenko did not know the identity of the person she was supposed to meet, only that she would be met at the airport. Ms. Kostenko was to play no further role in distribution. That role would have been carried out by the unknown person at the airport, and possibly others working with him. Ms. Kostenko was to receive $2,000 for her participation, a small amount relative to the fair market value of the cocaine imported. Thus, on the whole, the known facts support a mitigating role adjustment for Ms. Kostenko with respect to the relevant conduct attributable to her.

Mitigating role adjustments have been awarded to a variety of individuals with significant, active participation in drug offenses. See, e.g., United States v. Vega-Encarnacion, 914 F.2d 20, 23, 25 (1st Cir. 1990), cert. denied sub nom, Cruz-Rosario v. United States, 499 U.S. 977 (1991) (defendant solicited drug buyer and threatened to kill an individual who appeared to be a police officer, but was still granted minor role); United States v. Hagan, 913 F.2d 1278, 1283 (7th Cir. 1990) (defendant who lived on the farm where 60,000 marijuana plants were cultivated, weeded the plants, and had knowledge of the plants' nature still a minor participant); United States v. Garvey, 905 F.2d 1144, 1146 (8th Cir. 1990) (minor participant status for a defendant who sold 9.13 kilograms of hashish oil and had prior drug activity); United States v. Davis, 878 F.2d 1299, 1300

(11th Cir.), *cert. denied*, 493 U.S. 941 (1989) (defendant's full "understanding of the scope and nature of the enterprise" made her role minor rather than minimal in the possession of over 500 grams of cocaine);   United States v. Paulino, 873 F.2d 23 (2d Cir. 1989) (defendant found to be minimal participant where he admitted that he had served as a lookout for a cocaine distribution operation and pled guilty to possession with intent to distribute cocaine); United States v. Sailes, 872 F.2d 735 (6th Cir. 1989) (defendant who allowed her adult son to use her home as a base for his illegal cocaine dealing operation and assisted him in this business awarded a four-point reduction); United States v. Hallam, 723 F.Supp. 66 (N.D.Ind. 1989)(defendant who permitted a relative to store six kilograms of cocaine in his home and allowed similar storage at a neighbor's home received a four point reduction for minimal participation).

If not a minimal participant, Ms. Kostenko surely played no more than a minor role in this offense. The Sentencing Commission intended that the "minor participant" role apply to "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n. 3). Ms. Kostenko was certainly less culpable than the other participants in this offense, some of whom have been identified in her statement to the probation office. She had no ownership interest. She had no role in distribution. She had no role in planning. She had no significant knowledge and no decision making authority whatsoever. She was a mule.

For all the above reasons, Lori Kostenko asks the Court to grant a four level downward adjustment of her offense level to reflect her minimal role in the offense. In the alternative, Defendant requests a three level adjustment to reflect a role that was in between minimal and minor. As a third alternative, Defendant asks for a two level adjustment as a minor participant.

6

## III.    BOOT CAMP.

Ms. Kostenko respectfully asks the Court to recommend to the Bureau of Prisons that she be designated to the Intensive Confinement Program (Boot Camp). The philosophy of this program offered by the Bureau of Prisons is "to place inmates in a highly structured environment as a means of promoting personal development, self-control, and discipline, thereby reducing the potential for recidivism." BOP Program Statement at 2 (copy attached). This program, which has been highly successful, offers an attractive alternative to long prison sentences for young offenders with little or no criminal background.

Eligibility for admission to the Intensive Confinement Program requires that the inmate is:

(1)    (i)    Serving a sentence of more than 12, but not more than 30 months; or

(ii)    Serving a sentence of more than 30, but not more than 60 months, and is within 24 months of a projected release date;

(2)    Serving his or her first period of incarceration or has a minor history of prior incarcerations;

(3)    Is not serving a term of imprisonment for a crime of violence;

(4)    Appropriate for housing in minimum security;

(5)    Physically and mentally capable of participating in the program;

(6)    A volunteer.

BOP Program Statement at 2 (copy attached).

On information and belief, Lori Kostenko meets each of the criteria for admission to the BOP Intensive Confinement Program. A recommendation from the sentencing judge is important to the selection process. Defendant respectfully asks the Court to recommend to the Bureau of Prisons that

7

she be considered for placement in the Intensive Confinement Program.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By:     _____

Patrick M. Hunt
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 571962
101 NE 3rd Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 356-7436 / 356-7556 (Fax)

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the aforementioned motion was mailed on this 31st

day of August, 1999, to AUSA Roger Steffin, 299 East Broward Boulevard, Ft. Lauderdale, FL

33301, and to USPO Karen Howard, Room 315, US Courthouse, 300 NE First Avenue, Miami, FL

33132.

_____

Patrick M. Hunt

8



Federal Bureau of Prisons

# Program Statement

**OPI:** CPD
**NUMBER:** 5390.07
**DATE:** April 24, 1996
**SUBJECT:** Intensive Confinement Center Program

**EFFECTIVE DATE:** May 28, 1996

1. **[PURPOSE AND SCOPE § 524.30. The intensive confinement center program is a specialized program combining features of a military boot camp with the traditional correctional values of the Bureau of Prisons, followed by extended participation in community-based programs. The goal of this program is to promote personal development, self-control, and discipline.]**

2. **PROGRAM OBJECTIVES.** The expected results of this program are:

   a.  Inmates who are eligible and approved will be able to participate in structured, intensive programs designed to promote personal development, self-control, and discipline;

   b.  Inmates who complete the institution-based component of the intensive confinement program will ordinarily be able to serve the balance of their sentences in community-based programs; and,

   c.  Eligible inmates who complete the institution-based component of the intensive confinement program and maintain successful participation in the community-based component will be considered for a reduction in sentence not to exceed 6 months.

3. **DIRECTIVES AFFECTED**

   a.  **Directive Rescinded**

      O.M. 249-93 (5390)   Intensive Confinement Centers (10/15/93)

   b.  **Directives Referenced**

      P.S. 5100.05   Security Designation and Custody
                     Classification Manual (06/16/94)
      P.S. 5270.07   Inmate Discipline and Special Housing Units
                     (12/29/87)

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

✗   NAT'L U.S CITIZENS could be subject to
    deportation if current offense took place within
    5 years of being NATURALIZED. Per INS & TPA -...

P.S. 7310.03    Community Corrections Center (CCC)
                Utilization and Transfer Procedure (03/25/96)

18 U.S.C. § 4046

4. STANDARDS REFERENCED

a. American Correctional Association Foundation/Core
Standards for Adult Correctional Institutions: FC2-4091,
C2-4173, C2-4249.

b. American Correctional Association 3rd Edition Standards
for Adult Correctional Institutions: 3-4268, 3-4282, 3-4289,
3-4291.

c. American Correctional Association Foundation/Core Standards
for Adult Local Detention Facilities: FC2-5092, C2-5241,
C2-5266.

d. American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities: 3-ALDF-3E-08, 4B-02, 4G-08.

e. Manual of Standards for Adult Correctional Boot Camp
Facilities (July 1994).

5. PROGRAM PHILOSOPHY AND STRUCTURE

a. ICC Philosophy. The purpose of an ICC is to place inmates
in a highly structured environment as a means of promoting
personal development, self-control, and discipline, thereby
reducing the potential for recidivism. ICCs are specialized
programs that integrate military boot camp philosophy with the
Bureau's traditional correctional values. Although these
programs involve a very intensive, highly structured environment,
the Bureau's "core values" and procedures of inmate management
are maintained. Accordingly, ICC programs do not include verbal
or physical abuse, or summary discipline.

b. ICC Structure and Program Components. An Intensive
Confinement Center (ICC) is a single sex, minimum-security
institution designed to house either male or female adult
inmates. Inmates who meet ICC eligibility criteria are placed in
the program for six months. The program consists of strict
discipline and a daily regimen of physical conditioning, military
drills and ceremonies, labor-intensive work assignments, an adult
literacy program, vocational training, drug and alcohol
counseling, stress management programs, life coping skills,
parenting programs, a positive personal attitude and self-esteem
program, family budgeting classes, nutritional information, and
other programs consistent with the "total wellness" concept.

Traditional privileges allowed by the Bureau, such as radios,
are ordinarily not available to ICC inmates, and television
viewing is limited during the extended six-day work week.

Performance Pay is not available to ICC inmates for work
assignments. Additionally, the rigorous nature of the 17-hour
program and work day permits little free time. Thus, visiting
and telephone priviliges are limited. Through this system of
structure, discipline and programming focus, inmates can improve
their physical, social, and emotional well-being.

## 6.  [ELIGIBILITY AND PLACEMENT § 524.31

**a.  Eligibility for consideration of placement in the intensive
confinement center program requires that the inmate is:**

**(1)  (i)  Serving a sentence of more than 12, but not more
than 30 months (see 18 U.S.C. 4046):or]**

Inmates serving sentences of more than 12 but not more
than 30 months are ordinarily placed in ICC's at initial
designation.

**[(ii)  Serving a sentence of more than 30, but not more
than 60 months, and is within 24 months of a projected release
date.]**

Inmates serving sentences of more than 30, but not more
than 60 months ordinarily are placed in ICCs upon transfer from
other institutions.

**[(2)  Serving his or her first period of incarceration or
has a minor history of prior incarcerations;]**

Ordinarily, a minor or serious history of incarceration
should be defined according to the "type of prior commitment"
category in the Security Designation and Custody Classification
Manual; however, for ICC placement purposes, juvenile
adjudications in the moderate severity offense category should be
considered as a minor history of incarceration.

**[(3)  Is not serving a term of imprisonment for a crime of
violence;]**

Criteria for whether an offense involves violence are
contained within the Bureau's policy "Definitiion of Term, Crimes
of Violence."

**[(4)  Appropriate for housing in minimum security;]**

Ordinarily, an inmate's security level should be "minimum"
before placement in an ICC. Exceptions to this requirement may
only be made by the Regional Director in the region where the ICC
is located.

**[(5)  Physically and mentally capable of participating in
the program;**

(6)   A volunteer.

b.  **Placement in the intensive confinement center program is to be made by Bureau staff in accordance with sound correctional judgment and the availability of Bureau resources.]**

ICCs are designed for male or female inmates identified by the Bureau who meet all of the above criteria.  Ordinarily, priority placement consideration will be given to eligible offenders who pose a greater risk of reinvolvement with criminal activity. Offenders who, by virtue of their lack of program needs, do not require the intensive specialized programs offered at an Intensive Confinement Center facility ordinarily will not be accepted for ICC placement.

c.  <u>Designation/Redesignation and ICC Placement</u>.  One method of ICC placement occurs when a Court recommends an offender's placement in the program at sentencing.  In limited circumstances, the CCM may determine that an inmate is appropriate for the ICC, when the sentencing Judge did not recommend placement on the Judgment in a Criminal Case order.  In this case, the CCM or Warden must notify the sentencing Judge before placement (Attachment A shall be used for all inmates with more than 12, but not more than 30 month sentences. Attachment B shall be used for all inmates with sentences greater than 30 months).

(1)  <u>Priority Assignment/Waiting List</u>.  Direct court commitments have priority over institution transfers, (who are placed on a waiting list and accepted into the program in sequential order), provided their sentences are within the specified time frame and bedspace is available.  Initial designations or transfer cases may be denied by the Regional Designator if they fail to meet the established criteria.

(2)  <u>Eligibility Determination</u>.  The CCM identifies potential participants for ICC placement through notation on the BP-337 (Inmate Load and Security Designation Form) under the "REMARKS" section.  This form is completed and routed via SENTRY to the appropriate Designator.

(3)  <u>Designation Review and Approval</u>.  For initial designations, Regional Designators shall review all applicable information on the "Inmate Load Data" Form, and make the final designation.  The Designator must ensure ICC staff are aware of new designations.  This is accomplished by entering the appropriate CMA assignment that reflects the ICC TEAM (number).

(4)  <u>Redesignation of ICC Cases</u>.  For proposed redesignation of ICC cases, the SENTRY request for transfer form (SENTRY form BP-409) shall be sent to the Regional Designator in the region where the ICC is located.  Information concerning the status of the notification to the sentencing court shall be included under "Additional Information."  Unit staff shall use the appropriate

sample letter (Attachment A or B) to notify the sentencing Judge before placement if there was no judicial recommendation for ICC placement at the time of sentencing.

(5) Designation Monitoring. The ICC Administrator and Designator must routinely monitor designations to ensure that a backlog of designations does not occur, and that timely inmate movement occurs. Staff shall use the CMA assignment "ICC TEAM (number)" for tracking designated and redesignated inmates to the ICC. The ICC Administrator shall notify all Regional Designators and CCMs via SENTRY EMS when a particular team schedule date is full.

(6) Inmate Refusal. If the Regional Designator is informed that the inmate refuses to participate in the ICC, routine redesignation procedures shall be followed, and the inmate is not to be penalized in any way for refusing the program. If the inmate refuses ICC participation, staff shall document the refusal on the Inmate Acknowledgement For ICC Placement form (Attachment C). Unit staff shall then immediately request redesignation to an appropriate facility by the respective Regional Designator.

(7) Detainers and Special Circumstances. When considering inmates who are non-U.S. citizens for ICC placement (initial designation or transfer), the CCM or Regional Designator shall check for deportation detainers or the probability of one being lodged against the inmate. If a deportation detainer exists or is probable, the inmate shall ordinarily not be a suitable candidate for ICC placement.

All other detainers and pending charges must be resolved prior to placement in the ICC. If a detainer is lodged at anytime after the inmate has begun the ICC program, the ICC Administrator shall be informed. If the detainer cannot be resolved, the inmate shall be removed from the program.

If the inmate is eligible for early release and has a "4046C CMPL" date, the ICC Administrator shall prepare the Notification of Change in ICC Sentence Reduction Status (Attachment E) and forward it to the Inmate Systems Management (ISM) department. If the detainer is subsequently removed and the inmate continues in the ICC program, a new Notification of ICC Sentence Reduction (Attachment D) shall be forwarded to ISM.

7. INTAKE PROCESSING. ICC staff shall fully orient each potential participant, determine the inmate's willingness to participate in the program, and ensure each inmate meets the established eligibility criteria described in Section 6, Eligibility and Placement. Staff shall also determine that each inmate is physically able to participate in the program by completing the Medical History Report (BOP Med-36) subsequent to the routine physical examination.

Once established, staff shall have the inmate sign the Inmate
Acknowledgement For ICC Placement Form (Attachment C).

8.  [INSTITUTION-BASED COMPONENT PROCEDURES § 524.32

    a.  An eligible inmate who volunteers for participation in an
institution-based intensive confinement center program must agree
to forego opportunities which may be otherwise available to
inmates in Bureau institutions.  Opportunities that may be
affected include, but are not limited to, visitation, telephone
use, legal research time, religious practices, commissary,
smoking, and grooming preferences.

    b.  The institution-based component of the intensive
confinement center program ordinarily is six months in duration.

    c.  Disciplinary procedures to be followed in the institution-
based intensive confinement center program are set forth in
subpart B of part 541 of this chapter.]

    Subpart B of part 541 refers to the Program Statement on
Discipline and Special Housing Units.

    [(d)(1)  An inmate who successfully completes the institution-
based component of the program ordinarily is eligible to serve
the remainder of the sentence in a community-based program.

    (2)  An inmate eligible for participation in the program
under § 524.31(a)(1)(i) who successfully completes the
institution-based component, who maintains successful
participation in a community-based program, and has a period of
supervised release to follow is eligible for up to a six month
reduction in sentence.]

    Inmates eligible for participation in the program under
§ 524.31(a)(1)(i) are serving a sentence of more than 12, but not
more than 30 months.

    [(3)  An inmate who completes or has completed the
institution-based component of an intensive confinement center
pilot program, who maintains successful participation in a
community-based program, and has a period of supervised release
to follow is eligible for up to a six month reduction in sentence
if staff confirm that the inmate has met the requirements of
§ 524.31(a)(1)(i),(2),(3) and (4)].

    The term "pilot program" referenced in the above rule text
refers to the initial implementation of the Intensive Confinement
Center program.

    This provision is necessary to retroactively allow for
sentence reduction consideration for an inmate serving a sentence
of more than 12, but not more than a 30 month sentence who had
been placed in the program before the implementation of this
Program Statement.  An inmate previously placed in the program is

allowed to complete the program and is then eligible under
paragraph (d)(1) for extended community-based programming. There
is a theoretical possibility that an inmate previously placed in
the program would not be eligible for placement under the current
provisions (e.g., the inmate's offense meets the criteria
defining a crime of violence as specified in § 524.31(a)(3)).
Therefore, staff must verify that such inmates meet the same
standards currently applicable for placement in the program
before allowing them consideration for sentence reduction.

**9.   [PROGRAM FAILURE § 524.33.  An inmate who fails to complete
the institution-based component or who subsequently fails
participation in a community-based program may forfeit his or her
further involvement in the program.]**

The ICC Administrator may terminate participants who fail to meet
the requirements of ICC participation.  If an inmate who is
eligible for sentence reduction is removed from the ICC program,
the ICC Administrator shall forward the Notification of Change in
ICC Sentence Reduction Status (Attachment E) to the Inmate
Systems Management department.  Upon receipt of Notification of
Change in ICC Sentence Reduction Status, Inmate Systems staff
shall remove the projected "4046C CMPL" date. Inmates who do not
fully complete the program shall be redesignated to an
appropriate institution to serve the imposed sentence without the
benefit of any special incentives identified in this Program
Statement.

An inmate who fails to comply with CCC or Home Confinement
requirements and is terminated from community-based programming
shall be redesignated pursuant to the Security Designation and
Custody Classification Manual.

**10.   COMMUNITY PLACEMENT TRANSITION.**  Participation in the ICC
Program is voluntary.  An inmate who successfully completes the
program may have the opportunity to serve the remainder of
his/her sentence in a community-based program, in the inmate's
home community when practicable.  Inmates shall not be considered
for transfer to a CCC unless all pending charges and detainers
are resolved with the appropriate authorities.  Inmates must be
making an effort to pay any special assessments, fines,
restitution, or other court-ordered financial obligation(s). An
inmate in IFRP "Refusal Status" may not be transferred to a CCC.
An inmate may be removed from community-based participation
should he/she fail to continue to make an effort to pay any
financial obligation.

In view of an inmate's successful completion of the rigorous ICC
program, the time allowed for Community Corrections program
participation may be increased.  The specific time permitted for
each phase of community program participation is based on an
inmate's total sentence length, as well as the inmate's overall
adjustment to the program, resources available, and legal
restrictions.  The CCM shall have the authority to adjust the
length of time spent in each phase.

Typically, ICC graduates will be placed in the pre-release
component of the CCC following completion of an orientation
period. In addition, some ICC graduates may be eligible for early
release, not to exceed 6 months, if certain criteria are met.

Within 30 days after the beginning of an ICC class, the ICC
Administrator shall complete a Notification of ICC Sentence
Reduction (Attachment D) on all inmates who are eligible for
early release.  The Notification of ICC Sentence Reduction shall
be forwarded to the Inmate Systems (ISM) department.  ISM staff
shall enter the ICC graduation date noted on Attachment D into
SENTRY to calculate the new "4046C CMPL" date.  Thirty days prior
to the "4046C CMPL" date, the CCM shall review each case and
prepare the release paperwork if the inmate:

♦ has successfully completed the six month ICC institution
  program;

♦ is sentenced to a term of more than 12 months, but not more
  than 30 months;

♦ has established a release plan acceptable to the Bureau  and
  the U.S. Probation Officer, including residence and
  employment;

♦ has shown consistent employment in the CCC;

♦ has maintained acceptable conduct (see Section 12);

♦ has, in the CCM's judgement, met the general program goals
  of the CCC as well as any specific goals established for the
  inmate;

♦ has a period of supervised release to follow; and

♦ has, for ICC Drug cases, in the judgment of the Transitional
  Services Manager (TSM), satisfactorily participated in
  community-based drug treatment.

In some cases, the CCM may determine that one or more of these
criteria have not been satisfactorily met and will recommend to
the CCRA, through the MCA, that the early release date be delayed
at least temporarily.  In such cases, the inmate shall be
notified in writing of the reasons for the delay and be provided
with a new "4046C CMPL" date.  Each time a change is made to the
"4046C CMPL" date, a copy of the notification to the inmate shall
be placed in the J&C file, and the inmate's new "4046C CMPL" date
will be entered into SENTRY by CCM staff.

If the inmate later satisfactorily meets the criteria,  the CCM
shall be notified immediately and the release paperwork prepared
as soon as practicable.  If early release was denied or delayed

for any reason and the inmate remains in the CCC or on Home Confinement, the CCM shall review the case at least monthly until the sentence is completed, or the inmate is returned to an institution.

There are two Community Corrections stages:

♦ the Community Corrections Center; and,

♦ Home Confinement.

If an inmate is ineligible for early release, the inmate will typically remain in Home Confinement following completion of the Community Corrections Center stage.

**COMMUNITY CORRECTIONS STAGES FOR INMATES SERVING SENTENCES OF MORE THAN 12, BUT NOT MORE THAN 30 MONTHS DESIGNATED TO THE ICC**

| Sentence | ICC | CCC | Home Conf. | Amount of Reduction |
|----------|-----|-----|------------|---------------------|
| 12-16 mos | 6 mos | 2-3 mos | (Remainder | 3 mos |
| 17-20 mos | 6 mos | 2-3 mos | of Term | 4 mos |
| 21-25 mos | 6 mos | 3-5 mos | Less Amount | 5 mos |
| 26-30 mos | 6 mos | 4-6 mos | of Reduction) | 6 mos |

**COMMUNITY CORRECTIONS STAGES FOR INMATES SERVING SENTENCES GREATER THAN 30 MONTHS DESIGNATED TO THE ICC**

These inmates shall be transferred to the ICC <u>no earlier than 24 months prior to a projected release date, with optimum time for placement at 18 to 20 months.</u> The maximum placement shall permit six months in the ICC, 12 months in the CCC, and up to six months or 10 percent of their total term, whichever is less, on Home Confinement.

Transfer to a CCC and progression through the stages is dependant upon an inmate's favorable adjustment. Inmates who fail to comply with CCC or Home Confinement program requirements may be placed in a more restrictive program phase, or terminated from Community Corrections programs altogether and returned to a regular correctional institution for the remainder of their sentence.

a. **Staff Referral**. Three months prior to completion of the six-month Intensive Confinement Center Program, staff will refer an inmate who they anticipate will successfully complete the program to the appropriate CCM for placement in a CCC. Ordinarily, an inmate shall be transferred to a CCC immediately following completion of the ICC program. At the CCC, inmates progress through phases of increasing freedom based on demonstrated personal responsibility and commitment to law-abiding behavior. In most cases, the CCC phase will end with a period of Home Confinement.

b. <u>Community Corrections Center</u>. Typically, inmates serving sentences greater than 30 months shall be placed in the CCC pre-release component following completion of an orientation period.

c. <u>Home Confinement</u>. Inmates serving sentences over 30 months are not eligible to have their sentences reduced by the Bureau. Nevertheless, absent unusual circumstances, these inmates shall be placed on Home Confinement as soon they are eligible by statute (not to exceed 6 months or 10% of the term to be served), with the CCM's approval.

d. <u>Fee Collection</u>. If fees are collected from inmates in any Home Confinement program, these fees shall not exceed the cost of the program and shall be used to defray program costs. All funds collected from those in Bureau operated programs shall be deducted from the monthly billings submitted to the Bureau. Those in Home Confinement programs operated by the U.S. Probation Service shall be instructed regarding the appropriate payment procedures as directed by the Probation Officer.

11. <u>REFERRAL TO A COMMUNITY CORRECTIONS CENTER</u>. The brief (six-month) ICC program period, and the need to move inmates who complete the program to a CCC quickly, require expeditious processing of these referrals.

a. <u>Inmates Needing Drug Treatment</u>. All inmates in the ICC shall be assessed as to their drug history and the potential need for follow-up treatment when released to the community phase. Once identified, these inmates shall be entered into SENTRY (see Section 16) to alert the Regional Transitional Services Managers of prospective participants in the drug transition program. Further, ICC inmates identified for transitional services must sign the "Agreement to Participate in BOP Community Transition Programing" form, found in the Inmate Drug Abuse Programs Manual. This agreement and information regarding the inmate's participation in the ICC Drug Treatment Program shall be included in the CCC referral packet. Regional Transitional Services Managers and community corrections staff shall make every effort to place all identified inmates in an appropriate transition program.

b. <u>CCC Referral Information</u>. As part of the ICC program planning process, referral information must be sent out approximately 90 days after the inmate's arrival at the ICC. This time frame differs from the time frame for general institution transfers, which must be mailed at least 60 days prior to the requested placement date. ICC referral packets also differ from general institution transfer packets in that an Inmate Acknowledgement form and a sentence computation must be included in the packet. Staff shall forward referral material to the appropriate CCM and TSM as required by the Community Corrections Center (CCC) Utilization and Transfer Procedures program statement and the Inmate Drug Abuse Programs Manual.

The CCM shall respond within 30 days of receipt. The notification shall be accomplished by the CCM adding the destination assignment (DST) for a CCC to the inmate's SENTRY record.

If there are any problems with placing the inmate on the requested date, the CCM shall contact the Management Center Administrator (MCA) for assistance and notify the ICC Administrator.

Actual transfer of ICC inmates shall be accomplished <u>using the same procedures</u> as any other furlough transfer to a CCC.

c. <u>ICC Pre-Release</u>. Each ICC graduating team shall participate in a Pre-Release meeting that includes presentations by Community Corrections, U.S. Probation, and, if possible, CCC contract staff.

12. <u>DISCIPLINE PROCEDURES</u>. All ICC graduates found guilty of the most serious level (100 series) of infractions shall be removed from the CCC or Home Confinement and transferred to a secure facility for the remainder of the committed sentence.

For less serious (200 to 400 level) infractions, the usual range of graduated sanctions is available. The CCM shall be notified immediately if the inmate is found guilty of a 200 to 400 level infraction. Depending on the circumstances of the infraction, the CCM may either allow the inmate to remain in the CCC or recommend to the CCRA, through the MCA, that the inmate be returned to secure custody. If the CCRA determines that the inmate is to be returned to a secure institution as the result of a <u>disciplinary finding</u>, this shall result in removal from the ICC program and the loss of the early release date. An inmate returned to secure custody may be considered for referral to a CCC for pre-release programming at a later date in accordance with Bureau policy applicable to general population inmates.

ICC graduates found guilty of an isolated 300 or 400 level infraction can remain in the CCC or on home confinement with the CCM's approval. In some rare cases, ICC graduates found guilty of a 200 level infraction may also remain in the CCC (or be returned to the CCC from Home Confinement) with the CCM's approval.

If the inmate is allowed to remain in the CCC following a disciplinary finding, the projected "4046C CMPL" date may be retarded as part of the disciplinary process. The CCRA, upon the CCM's recommendation, shall make the determination to retard or not retard the inmate's "4046C CMPL" date.

If the inmate is not removed from the CCC or Home Confinement for disciplinary reasons and meets all the criteria in Section 10, the inmate shall be released on the "4046C CMPL" date following a review by the CCM. Removal for administrative reasons (i.e., not

as the result of a disciplinary finding) will not in itself be a
reason for retarding or disallowing the "4046C CMPL" date unless
there is a sound correctional basis (e.g., the inmate has not
established an adequate release plan).

If the inmate remains in the community and the CCM recommends
retarding or denying release on the "4046C CMPL" date for any
reason, the CCRA shall make the final decision.  At that point,
the CCM shall review the inmate again at least monthly.  At a
later date, the CCM may approve a new "4046C CMPL" date.

If accepted into a CCC, the inmate must be aware that community
corrections program participation is part of the inmate's program
plan while in the CCC.  Failure to adhere to a continuing
treatment plan while under Bureau of Prisons custody shall result
in the inmate's return to the institution.

13.  **RESPONSIBILITIES**

   a.  **Community Corrections Manager.**  The CCM plays a significant
role in identifying potential candidates for the ICCs.  If the
CCM identifies a case that meets all the criteria but has not
been recommended by the court, the CCM shall ensure that the
sentencing court has been notified prior to placement (see
Attachment A or B).  CCMs shall use the aforementioned criteria
to verify eligibility for those who are being considered for
participation.  Once the candidate has been identified, this
information shall be forwarded via SENTRY to the respective
Designator.

   If the inmate "opts out" or is removed from the program during
the community phase, the CCM shall prepare written correspondence
to the judge who made the initial recommendation.

   The Community Corrections (CC) staff shall follow each case
closely through the CC phases.  If practicable, they shall attend
program planning meetings, regularly review the program plans and
progress reports, and meet with the inmate.

   The CCM must approve any movements between phases and ensure
that these movements are documented in the inmate's file.

   If an inmate meets the criteria for an early release, the CCM
will notify U.S. Probation 30 days prior to the "4046C CMPL" date
that an inmate is being released to supervision.  If the
"4046C CMPL" date is later delayed for any reason, the CCM shall
notify U.S. Probation of the projected release to supervision.

b. <u>Regional Designator</u>. Regional Designators make the initial designation to the ICC. The Designator shall consider all information provided by the CCM when making ICC designations. Should the Designator identify a possible participant not previously identified by the CCM, he/she shall contact the CCM to discuss the case. If the inmate is determined to be an appropriate candidate, the CCM or Warden shall ensure that the sentencing court has been notified prior to placement (see Attachment A or B). The CCM should ensure that the inmate's voluntary surrender date coincides with the ICC TEAM assignment before the designation request is submitted.

Designators shall use the appropriate SENTRY institution designation code (LEW/BRY ICC) for designations to the ICC and ensure the following is placed under the designator comments: "DES LEW/BRY ICC, TEAM (number)". Designators must also enter the appropriate CMA assignment, ICC TEAM (number), which coincides with the published ICC schedule. When the inmate's voluntary surrender date does not coincide with the ICC Team Assignment, the CCM shall contact the Court and request the date be modified accordingly.

Regional Designators shall not make secondary designations to an ICC program. The appropriate Regional Director, or designee, shall provide a written response to all judicial recommendations for ICC participation when the inmate is either not eligible or inappropriate for the ICC program. Inmates arriving at an ICC who elect to "opt out" shall be immediately redesignated by the respective Regional Designator to an appropriate institution.

If the transfer is for disciplinary purposes, normal disciplinary referral procedures shall be used.

c. <u>Intensive Confinement Center Administrator</u>. The ICC Administrator shall work closely with the appropriate Regional Designator to prevent a backlog of incoming or outgoing inmate designations. This requires daily monitoring of the CMA category "ICC TEAM (number)" and a strong line of communication between them.

The ICC Administrator shall immediately notify all Designators and CCMs via EMS when a particular TEAM schedule date is full, recommend the next date, and identify the number of vacancies available. If an inmate "opts out" or is removed from the program, the ICC Administrator shall prepare correspondence to the judge who made the initial recommendation. Such correspondence shall include a brief description of the inmate's participation at the ICC and the specific reason for failure. A copy shall be forwarded to the respective Regional Director and the Assistant Director, Correctional Programs Division.

ICC Administrators are ultimately responsible for ensuring that their respective "ICC Overview", used for familiarization and orientation, is accurate and updated at least quarterly.

Ocassionally, the inmate's sentence length may not permit sufficient transitional time in the CCC/Home Confinement component prior to release. In these circumstances, the ICC Administrator is authorized to retard the "4046C CMPL" date as needed by using Attachment F. The completed Attachment F shall be delivered to the inmate, and a copy forwarded to the Inmate Systems Manager.

14.  **RETROACTIVITY (EXISTING CASES).**  These procedures are retroactive for ICC graduates already in a CCC or on Home Confinement upon the effective date of this Program Statement. For Direct Court placements who have served past what would have been the "4046C CMPL" date when this Program Statement is effective, the CCM shall process the release paperwork provided that the inmate meets the criteria outlined above.

Inmates serving sentences of more than 12, but not more than 30 months who meet the criteria discussed in Section 10 and have not yet reached the "4046C CMPL" date would ordinarily be placed in the pre-release component, if not on Home Confinement, and shall be considered for release on the "4046C CMPL" date.

Ordinarily, inmates serving sentences over 30 months in the CCC at the time this Program Statement becomes effective shall be immediately placed in the pre-release component and shall be considered for Home Confinement as soon as eligible by statute.

15.  **COURT NOTIFICATION (FUTURE CASES).**  Immediately prior to implementing this Program Statement, the Bureau shall notify all Chief Judges and Chief U.S. Probation Officers of the intended change.  The courts should be notified that unless the sentencing Judge specifically indicates otherwise, all inmates shall be eligible for early release as provided herein.  If the court does not voice objections in a specific case, early release shall be considered.

16.  **SENTRY TRANSACTIONS.**  To effectively monitor the program and gather needed research data, the following SENTRY assignments are established for ICC participants:

a.  **CMA Category Assignments**

(1)  **BRY/LEW ICC 01,02,03**, etc.  Indicates the ICC Team number scheduled for the inmate. The CMA assignment used shall coincide with the respective ICC team schedule. Because of the limited number of inmates allowed to participate, this CMA assignment is of particular importance to Designators and ICC Administrators for tracking designations.

(2)  **ICC PART**    Intensive Confinement Center participants.

(3)  **ICC DECL**    Declined to participate in the ICC.

(4)  **ICC FAIL**    Intensive Confinement Center failure.

(5)  **ICC COMP**     Successfully completed ICC.

(6)  **ICC NOT EL**     Not eligible for ICC placement.

Note: Items 2 through 6 above represent CMA assignments that ICC staff shall enter into SENTRY to record the current status of the inmate's ICC participation. Only one Category Assignment shall be entered and considered valid at any given time. "ICC PART" must be entered for each inmate at the beginning of every ICC class. This assignment is eventually replaced by one of the other four CMA assignments identifying the result of the inmate's participation. The CMA team assignment must be retained permanently for research and statistical purposes.

b.  DRG Category Assignments

(1)  **ICC DRUG**     Requires community drug transition programs.

c.  COM Category Assignments

(1)  **C ICC CCC**     The Community Corrections Center stage of Community Corrections.

(2)  **C ICC HC**     The Home Confinement stage of Community Corrections.

(3)  **C ICC COMP**     Successful completion of the community ICC program. This assignment shall be entered immediately before the inmate is permanently released.

(4)  **C ICC DECL**     Declined to continue participation in the community ICC program.

(5)  **C ICC FAIL**     Community ICC program failure.

(6)  **C ICC RMV**     Community ICC program removal.

d.  DST Category Assignments

(1)  **BRY ICC**     Bryan Intensive Confinement Center.

(2)  **LEW ICC**     Lewisburg Intensive Confinement Center.

e.  Unit Category Assignments

(1)  **BIC**     Bryan Intensive Confinement Unit.

(2)  **LIC**     Lewisburg Intensive Confinement Unit.

The CMA assignments indicating the ICC Team number and the successful completion of the ICC program at Lewisburg or Bryan "4046C CMPL" will already exist on ICC inmates transferring to the community. These assignments must be retained permanently for research and statistical purposes.  The team number allows

continuous tracking of ICC inmates by teams from designation
through ICC and final completion of their sentence in the
community.

17.   INSTITUTION SUPPLEMENT.   Each ICC shall develop an
Institution Supplement to implement this Program Statement.   Each
Institution Supplement must include procedures for:

a.   Orientation of inmates to the program including a
determination of physical ability to participate;

b.   Monitoring of designations to avoid backlogs and ensure
timely movement into community corrections centers; and

c.   Termination for program failures and redesignation
procedures for such inmates.

A copy of the Institution Supplement shall be sent to the
Regional Correctional Programs Administrator and the
Administrator, Correctional Programs Branch, Central Office.

\s\
Kathleen M. Hawk
Director